UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
NEW YORK UNIVERSITY,

                Plaintiff,

          - against -

FACTORY MUTUAL INSURANCE COMPANY,

                Defendant.
------------------------------------X

**MEMORANDUM AND ORDER**

15 Civ. 8505 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff New York University (NYU) brought this suit against its insurer Factory Mutual Insurance Company (FM) after FM provided less than all of the coverage that NYU claims it was due under its insurance policy ("the Policy") for losses sustained when Superstorm Sandy struck New York City on October 29, 2012. NYU advanced five claims for declaratory relief, seeking to define certain relevant provisions of the Policy, and an additional claim for breach of contract based on FM's allegedly wrongful denial of coverage. In response to NYU's complaint, FM filed two counterclaims, seeking a declaratory judgment or, alternatively, reformation of the contract.

Before the Court are FM's motion for summary judgment and NYU's cross-motion for partial summary judgment. For the reasons set forth below, FM's motion is granted in all material respects, while NYU's motion is denied in its entirety.

## I. Background

The facts and procedural course of this case are set out in great detail in the Court's March 27, 2018 Memorandum and Order denying NYU's motion for leave to amend its complaint. See New York Univ. v. Factory Mut. Ins. Co., No. 15 CIV. 8505 (NRB), 2018 WL 1737745 (S.D.N.Y. Mar. 27, 2018). Relying on that lengthy opinion for a basic recounting of the case, this opinion provides only that background information needed to understand the resolution of the pending motions.

### A. Facts

#### 1. The Policy

The Policy, which is the focus of this dispute, was effective from July 1, 2011 through July 1, 2013. It generally insured NYU against physical loss or damage to certain real and personal property, subject to an overall coverage limit of $1.85 billion and other specified limits of liability and exclusions.

Beyond covering physical loss or damage itself, the Policy provided coverage for associated time element losses. Such losses, "[s]ometimes known as business interruption loss[es]," are "loss[es] resulting from the [insured's] inability to put damaged property to its normal use." ECF No. 113 at 5 n.17 (internal quotation marks omitted); accord ECF No. 129 at 2, 6. Specifically, the Policy's "Time Element Coverages" granted NYU "the option to make [a] claim" for either lost gross earnings or

lost gross profits "directly resulting from physical loss or damage of the type insured" under the Policy. ECF No. 116, Ex. 7 at NYU033551–033552. The Policy also contained certain "Time Element Coverage Extensions," which granted coverage for time element losses resulting from, inter alia, "the interruption of incoming [or outgoing]" utility services, "an order of [a] civil or military authority prohibit[ing] access to [an] insured location provided such order is the direct result of physical damage of the type insured," or "the failure of the Insured's electronic data processing equipment or media to operate, provided that such failure is the direct result of a malicious act directed at the [insured]." Id. at NYU033562 et seq. Under the express terms of the Policy, however, recovery for "TIME ELEMENT loss as provided in the TIME ELEMENT COVERAGES and TIME ELEMENT COVERAGE EXTENSIONS . . . is subject to the applicable limit of liability that applies to the insured physical loss or damage but in no event [can it be] for more than any limit of liability that is stated as applying to the specific TIME ELEMENT COVERAGE and/or TIME ELEMENT COVERAGE EXTENSION." Id. at NYU033551.

In addition to its general coverage of physical loss or damage and (to the extent applicable) associated time element losses, the Policy provided certain "Additional Coverages," including coverage for (1) "accidental interruption of services," defined to be "physical damage resulting from changes in temperature or relative

3

humidity . . . when such changes in temperature or relative humidity result from the interruption of services consisting of electricity, gas, fuel, steam, water or refrigeration by reason of any accidental event, other than insured physical loss or damage"; (2) "debris removal"; (3) "demolition and increased cost of construction," defined to be "the reasonable and necessary costs incurred . . . to satisfy the minimum requirements of the enforcement of any law or ordinance regulating the demolition, construction, repair, replacement or use of buildings, structures, machinery or equipment at an insured location"; (4) "patient and tenant relocation expense"; (5) "protection and preservation of property," defined to be "reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property"; and (6) "service interruption property damage," defined as "physical loss or damage to insured property at an insured location or as MISCELLANEOUS PERSONAL PROPERTY when such physical loss or damage results from the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service or from the lack of transmission of incoming or outgoing voice, data or video service." Id. at NYU033528 et seq. Much like the section of the Policy addressing coverage for time element losses, the section addressing these additional coverages stated that such coverages "are subject to the applicable limit of liability" and "applicable

4

exclusions and deductibles, . . . as shown in [the additional coverages section] and elsewhere in th[e] Policy." Id. at NYU033528.

A separate section at the very beginning of the Policy -- under the heading "LIMITS OF LIABILITY" -- set forth the Policy's overall coverage limit of $1.85 billion and, under the sub-heading "Applicable Limits of Liability/Time Limits," a list of 52 subsidiary limits that were "part of, and not in addition to," the overall coverage limit. Id. at NYU033511 et seq. For example, the Policy provided a limit of liability of "USD5,000,000 in the aggregate during any policy year" for loss attributable to "TERRORISM." Id. at NYU033514. Of particular relevance here, the Policy included a limit of liability for loss attributable to "flood," expressed in the Policy as follows:

> USD250,000,000 in the aggregate during any policy year, but not to exceed a USD40,000,000 limit in the aggregate during any policy year for property located at the NYU Hospital Center and School of Medicine located at 550-580 First Avenue, 401 & 435 E 30th Street, 317 & 400 E. 34th Street and 3010 [FDR] Drive, New York, NY in the aggregate during any policy year[.]

Id. at NYU033513. "Flood" was in turn defined in the Policy as:

> flood; surface waters; rising waters; storm surge, sea surge, wave wash; waves; tsunami; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; all whether driven by wind or not; or sewer back-up resulting from any of the foregoing; regardless of any other cause or event, whether natural or man-made, contributing concurrently or in any other sequence of loss. Physical loss or damage from flood associated with a storm or weather

5

disturbance whether or not identified by name by any meteorological authority, is considered to be flood within the terms of this Policy. However, physical loss or damage by fire, explosion or sprinkler leakage resulting from flood is not considered to be loss by flood within the terms and conditions of this Policy.

Id. at NYU033583.

At the top of the "LIMITS OF LIABILITY" section, prior to the "Applicable Limits of Liability" subsection, the Policy set forth the following general provisions pertaining to limits of liability:

Limits of liability in an occurrence apply to the total loss or damage at all locations and for all coverages involved, including any insured TIME ELEMENT loss, subject to the following provisions:

1) when a limit of liability applies in the aggregate during any policy year, the Company's maximum amount payable will not exceed such limit of liability during any policy year.

2) when a limit of liability applies to a location or other specified property, such limit of liability will be the maximum amount payable for all loss or damage at all locations arising from physical loss or damage at such location or to such other specified property.

Id. at NYU033511.

Finally, the Policy provided a list of specific "exclusions" from coverage. Id. at NYU033521 et seq. For example, the Policy expressly excluded coverage for "faulty workmanship," "wear and tear," and the "settling, cracking, shrinking, bulging, or expansion of . . . walls." Id. at NYU033524. The Policy did, however, provide that "if physical damage *not* excluded by th[e]

6

Policy results" from one of those sources, then "that resulting damage is insured." Id. (emphasis added).

## 2. Superstorm Sandy And Its Aftermath

On October 29, 2012, Superstorm Sandy struck New York City, causing significant damage to several NYU properties that both parties agree were covered under the Policy. The parties dispute the extent of that coverage, as well as whether (and the extent to which) "faulty workmanship" contributed to NYU's losses. ECF No. 113 at 33. But the parties agree that NYU sustained substantial time element losses as a result of the damage.[1]

The dispute that gave rise to the instant litigation primarily concerns the scope and proper application of the clause in the Policy that provides for a $250 million limit of liability for damage caused by flood ("the flood limit") and a subsidiary limit of $40 million in coverage for flood damage at certain specified locations ("the flood sublimit"). In particular, the parties disagree as to how that clause impacts the amount of coverage that is provided in the Policy for the losses that NYU sustained at (and in relation to) the complex of buildings -- all associated

---

[1] The Court need not directly wade into the divergent ways in which the parties characterize the various causes of NYU's losses in order to resolve the pending motions. See ECF No. 136 at 18-22. It is sufficient for present purposes to deem undisputed the basic facts that multiple NYU properties sustained significant water damage; that a considerable interruption of NYU's business resulted; and that NYU sustained losses from certain of the sources contemplated in the "Time Element Coverage Extensions" and "Additional Coverages" sections of the Policy, such as interrupted utility services, forced evacuation of buildings, and patient relocation.

with NYU's hospital or medical school -- located between First Avenue, 34th Street, FDR Drive, and 30th Street in Manhattan ("the superblock").

Citing the flood sublimit, FM capped its payments to NYU for all superblock damages at $40 million. NYU, advancing a different interpretation of the flood sublimit and its interaction with other provisions in the Policy, claimed entitlement to substantially more money -- potentially extending to the overall coverage limit of $1.85 billion. With the parties unable to reach an agreement, NYU initiated this suit.

### B.    Procedural History

On October 29, 2015, NYU filed the operative initial complaint, asserting six causes of action against FM. Five seek declaratory relief, including declarations that (1) the flood sublimit applies only to those buildings within the address range specified in the sublimit ("550-580 First Avenue, 401 & 435 E 30th Street, 317 & 400 E. 34th Street and 3010 [FDR] Drive, New York, NY"), rather than to all of the buildings located on the superblock; (2) the flood limit does not apply to time element losses; (3) the flood sublimit does not apply to time element losses; (4) the flood sublimit does not apply to additional coverages and time element coverage extensions; and (5) the coverage limits for flood damage do not apply to damage that would not have occurred but for faulty workmanship. NYU's sixth cause

of action -- for breach of contract -- alleges that FM wrongfully denied NYU coverage, based on its construction of the aforementioned provisions of the Policy. FM, for its part, asserted two counterclaims, seeking (1) a declaration that the flood sublimit applies to all of the buildings located on the superblock, and (2) alternatively, reformation of the flood sublimit to the extent that it can be read as applying only to those buildings encompassed in the address range specified therein.

After more than a year of discovery, NYU moved for leave to amend its complaint, which motion was denied by the Court in a March 27, 2018 Memorandum and Order on the ground that all "of the claims that NYU [sought] to add [were] untimely and . . . merit[less]," rendering amendment "futile." New York Univ., 2018 WL 1737745, at *18. Following that Memorandum and Order, the parties each filed motions for summary judgment.

FM's motion seeks summary judgment on all six of NYU's claims as well as on both of its counterclaims. NYU's cross-motion seeks summary judgment on both of FM's counterclaims as well as on all five of its claims for declaratory relief; as to its claim for breach of contract, NYU merely opposes FM's motion for summary judgment.

## II.  Discussion

### A.  Legal Standards

The following legal standards govern the Court's analysis of the pending motions.

#### 1.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(a).  "A fact is *material* when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (emphasis added) (internal quotation marks omitted).  On a motion for summary judgment, "[t]he moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact[,] [and]  [w]here the moving party meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (internal quotation marks and citation omitted).  "To defeat a summary judgment motion, the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts, and [it] may not rely on conclusory allegations or unsubstantiated speculation."  Id. (internal quotation marks

and citation omitted).  "Where it is clear that no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment should be granted."  Id. (internal quotation marks omitted).

"The same standard . . . applies when," as here, "the court is faced with cross-motions for summary judgment.  Each party's motion must be reviewed on its own merits, and the Court must draw all reasonable inferences against the party whose motion is under consideration."  Bell v. Pham, No. 09 CIV. 1699 PACRLE, 2011 WL 1142857, at *2 (S.D.N.Y. Mar. 24, 2011) (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)).

### 2.  Rules of Insurance Policy Interperion

"In New York, 'insurance policies are interpreted according to general rules of contract interpretation.'"[2]  Am. Commercial Lines LLC v. Water Quality Ins. Syndicate, 679 F. App'x 11, 13–14 (2d Cir. 2017) (quoting Olin Corp. v. Am. Home Assurance Co., 704 F.3d 89, 98 (2d Cir. 2012)).  "[T]he initial interpretation of a contract [in New York] is a matter of law for the court to decide."  VKK Corp. v. Nat'l Football League, 244 F.3d 114, 129 (2d Cir. 2001) (internal quotation marks omitted).  "Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous."  Id.  "[I]f the contract is capable of only one reasonable interpretation, i.e., [if it] is

---

[2] The parties agree that New York law applies.

unambiguous, [the Court is] required to give effect to the contract as written." Id. (alteration in original) (internal quotation marks omitted); see also Brad H. v. City of New York, 17 N.Y.3d 180, 185 (2011) ("A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties.").

"If, however, the court determines that a provision in [an] insurance contract is ambiguous, it may consider extrinsic evidence to discern the parties' intent at the formation of the contract." Am. Commercial Lines LLC, 679 F. App'x at 14; cf. Wallace v. 600 Partners Co., 86 N.Y.2d 543, 548 (1995) ("The rules governing the construction of ambiguous contracts are not triggered unless the court first finds an ambiguity."). "An ambiguity exists where the terms of [the] insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement . . . ." Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002).

**B.  Analysis**

With the foregoing legal principles in mind, the Court next considers the parties' arguments.

1. **Time Element Losses and Time Element Coverage Extensions**

NYU's argument that the $250 million flood limit and the $40 million flood sublimit do not apply to time element losses, including those contemplated in the Policy's time element coverage extensions, is easily dispensed with.[3] That is because the Court squarely rejected virtually the same argument in the March 27, 2018 Memorandum and Order that denied NYU's motion for leave to amend its complaint, which analyzed earlier versions of the parties' insurance contract, including one version that contained operative language identical to that contained in the contract at issue here.

Specifically, the Court's prior opinion held that language in the limits of liability section of the policy that FM issued to NYU in 2006, which immediately preceded the list of specific limits of liability included in that policy, *unambiguously* "subjected time element claims to the limit of liability for flood." New York Univ., 2018 WL 1737745, at *12. That language provided that

---

[3] As a threshold matter, where the proper construction of a limit of liability in an insurance policy is at issue, the insurer is not subject to the "heavy" burden that applies where an insurer seeks to prove that a policy "negate[s] coverage by virtue of an exclusion." Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co., 472 F.3d 33, 42 (2d Cir. 2006) (internal quotation marks omitted). That is because "New York law does not construe language limiting the amount or extent of liability as an exclusion." Catlin Specialty Ins. Co., 629 F. App'x at 130 (citing Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, 21 N.Y.3d 139, 147 (2013)). Put more clearly, "a limit[] of liability is *not* an exclusion, and New York law does not permit [the Court] to find otherwise." Id. at 131 (emphasis in original).

the "Limits of liability stated below apply in the aggregate per occurrence for all Locations and coverages involved." Id. at *4 (internal quotation marks omitted). As the Court explained, "[t]he only reasonable interpretation of this straightforward provision is that the limit of liability for flood -- one of the '[l]imits of liability stated below' -- applies to 'all . . . coverages involved,' including physical loss and time element." Id. at *10.

Rejecting the same basic arguments now advanced in NYU's summary judgment papers, the Court further explained that "[a] review of [the policy] as a whole d[id] not change th[at] conclusion." Id. at *11. In particular, the Court rejected NYU's argument, based on the *expressio unius* canon of construction, that since certain of the limits of liability listed in the policy "specified that they applied to both property damage and time element," the "limits of liability that did not so specify" -- such as the flood limit -- "applied only to property damage." Id. This Court reasoned as follows:

> While New York law recognizes the *expressio unius* canon of contract construction, see, e.g., Sterling Inv. Servs., Inc. v. 1155 Nobo Assocs., LLC, 30 A.D.3d 579, 581 (2d Dep't 2006), the *inference* created by the *expressio unius* canon cannot take precedence over the unambiguous language of the contract. Rather, consistent with the general principle that interpretive tools need not be deployed when the contract is unambiguous, *expressio unius* should not be applied to create ambiguity where none would otherwise exist. Cf. Banco Espirito Santo, S.A. v. Concessionaria do Rodoanel Oeste S.A., 100 A.D.3d 100, 109 (1st Dep't 2012) ("[P]unctuation in a contract may serve as a guide to resolve an ambiguity that has not been created by

punctuation or the absence therein, but it cannot, by itself, create ambiguity."); Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1020 (2d Cir. 1985) (holding that the *ejusdem generis* canon of construction "is not in and of itself a rule of interpretation, but merely an aid to interpretation when the intention is not otherwise apparent" (quoting Brooklyn City R.R. Co. v. Kings Cty. Tr., 214 A.D. 506, 511 (2d Dep't 1925), aff'd mem., 242 N.Y. 531 (1926))).

Id. (emphases in original) (footnotes omitted).

In a footnote appended to that passage, the Court distinguished Hewlett-Packard Company v. Factory Mutual Insurance Company, No. 04 CIV. 2791TPGDCF, 2007 WL 983990 (S.D.N.Y. Mar. 30, 2007), on which NYU again relies:

> [T]he policy at issue in Hewlett-Packard differs materially from [NYU's 2006 policy]. While [NYU's 2006 policy] provided that "[l]imits of liability stated below apply in the aggregate per occurrence *for all Locations and coverages* involved," the Hewlett-Packard policy provided only that "[s]ublimits of liability stated are per occurrence unless stated otherwise and apply to a loss covered by this policy in excess of the deductible." The Hewlett-Packard court did not address the significance of this provision in applying the *expressio unius* canon, but the provision -- unlike the allegedly corresponding provision in [NYU's 2006 policy] -- is silent as to the *coverages* to which the sublimits apply. The Hewlett-Packard policy's provision that "[t]he maximum limits of liability indicated above apply blanket," which *precedes* the specific sublimits of liability upon which the Hewlett-Packard court relied, is also not a comparable provision.

Id. at n.10 (emphases in original) (citations omitted).

Finally, the Court rejected NYU's two remaining arguments, neither of which it attempts to resuscitate here.

The Court thereafter turned to the policy that FM issued to NYU in 2008 and summarily concluded that NYU's arguments regarding time element "fare[d] [even] worse against [that policy's even] more explicit language." Id. at *14. Rather than simply providing that "[l]imits of liability . . . apply" to "all . . . coverages involved," the 2008 policy's limits of liability section provided that "limits of liability in an [o]ccurrence apply to the total loss or damage at all [l]ocations and for all coverages involved, *including any insured TIME ELEMENT loss*." Id. (emphasis added) (internal quotation marks omitted). The Policy, which is the subject of the parties' cross-motions for summary judgement, featured language *identical* to this language in the 2008 policy. See ECF No. 116, Ex. 7 at NYU033511. The Court adheres to its reading of that language as unambiguous in subjecting time element claims to the limit of liability for flood, as well as its sublimit.

The reconstituted arguments in NYU's motion fail to persuade the Court otherwise. In particular, the Court finds unpersuasive NYU's renewed reliance on Northrop Grumman Corporation v. Factory Mutual Insurance Company, 805 F. Supp. 2d 945 (C.D. Cal. 2011), which considered a policy with materially different prefatory language in its limits of liability section. That policy provided: "When a limit of liability is shown . . . the Insurer's maximum limit of liability will not exceed such limit during any policy

year regardless of the number of locations, coverages or occurrences involved." ECF No. 127, Ex. 73 at 14. Simply put, this language bears no relation to the Policy's unambiguous dictate that "[l]limits of liability . . . apply to . . . any insured TIME ELEMENT loss." ECF No. 116, Ex. 7 at NYU033511.

Nor is the Court moved by NYU's argument -- a variant on its previously-rejected *expressio unius* argument -- that the reference in the operative provision to "all coverages involved" excludes time element from the flood limits because those limits "only 'involve[]' Property Damage coverage." ECF No. 129 at 33. Any doubt -- including any doubt as to whether the flood limits apply to time element coverage extensions -- is unequivocally resolved in FM's favor by language in the time element section of the Policy plainly stating that recovery for "TIME ELEMENT loss as provided in the TIME ELEMENT COVERAGES and TIME ELEMENT COVERAGE EXTENSIONS . . . is subject to the applicable limit of liability that applies to the insured physical loss or damage." ECF No. 116, Ex. 7 at NYU033551. Here, the "Applicable Limit[] of Liability[]" (as indicated by the sub-heading in the limits of liability section) that applies to the insured physical loss or damage is the flood limit, as qualified by its sublimit; time element claims arising from flood damage are thus expressly subject to those limits.

In view of the Policy's unambiguous language on this point, FM is entitled to summary judgment.

## 2. Additional Coverages

The same result obtains with regard to NYU's argument that the limit of liability for flood (and its sublimit) do not apply to the Policy's additional coverages, though they too are expressly made "subject to the applicable limit of liability." Id. at NYU033528. Again, NYU cannot overcome the unambiguous language in the limits of liability section stating that "[l]imits of liability in an occurrence apply to the total loss or damage at all locations and *for all coverages involved* . . . ." Id. at NYU033511 (emphasis added). "The only reasonable interpretation of this straightforward provision is that the limit[s] of liability for flood . . . appl[y] to 'all . . . coverages" implicated by the flood damage covered by those limits. New York Univ., 2018 WL 1737745, at *10 (fourth alteration in original).

NYU asks the Court to instead construe this language as providing that limits of liability in an occurrence apply only to coverages explicitly specified in each respective limit. Thus, in the event that NYU incurred costs "to remove debris from an insured location" (one of the Policy's additional coverages) as a direct result of a flood, the Policy would cover those costs up to the overall coverage limit of $1.85 billion, notwithstanding the Policy's $250 million limit of liability for damage from flood, because that limit does not specify that it applies to debris removal. ECF No. 116, Ex. 7 at NYU033535. For support, NYU

submits that in view of the provision's use of the plural word "limits," it cannot be that one limit of liability applies to all of the coverages involved in an occurrence.

The pluralization of the word "limits" cannot bear the weight that NYU attempts to place on it. NYU ignores the obvious reason that "limits" is pluralized: it precedes a list of 52 limits of liability. It is far more natural to read "limits" this way than to read it as effectively transforming the phrase "all coverages involved" into the phrase "all coverages explicitly specified in each respective limit." "Where the provisions of the policy 'are clear and unambiguous, they must be given their plain and ordinary meaning, and courts should refrain from rewriting the agreement.'" Horowitz v. Am. Int'l Grp., Inc., 498 F. App'x 51, 53 (2d Cir. 2012) (quoting U.S. Fid. & Guar. Co. v. Annunziata, 67 N.Y.2d 229, 232 (1986)); see also Neopharm Ltd. v. Wyeth-Ayerst Int'l LLC, 170 F. Supp. 3d 612, 615 (S.D.N.Y. 2016) ("[T]he Court may not find the contract ambiguous merely because the parties present alternative interpretations."); cf. Orient Overseas Assocs. v. XL Ins. Am., Inc., 2016 N.Y. Misc. LEXIS 2048, at *34-38 (Sup. Ct. N.Y. Cty. May 11, 2016) (interpreting identical precatory language as unambiguously subjecting any "loss . . . caused by flood,"

including losses contemplated by separate coverages, to the subject policy's "flood sublimit").[4]

Ultimately, the limits of liability for flood, read together with the surrounding language, evince a clear intent on the part of the parties to cap at the amounts specified therein FM's liability for losses caused by flood at the relevant locations. See First Tech. Capital, Inc. v. Airborne, Inc., 726 F. App'x 85, 86 (2d Cir. 2018) ("[T]he fundamental . . . precept of contract interpretation is that agreements are [to be] construed in accord with the parties' intent." (second and third alterations in original) (internal quotation marks omitted)).  Summary judgment for FM is thus appropriate on this point as well.

### 3.  Faulty Workmanship

NYU's argument that certain of its Sandy-related losses were caused not by "flood," as that term is defined in the Policy, but by separately covered "faulty workmanship," is similarly foreclosed by the unambiguous language of the contract.[5]

---

[4] The Orient Overseas court looked to the policy's dictate -- mirrored in the Policy at issue here -- that "limits of liability in an Occurrence apply to the *total loss or damage* at all Locations and for all coverages involved," and applied the principle of New York law providing that where a "policy states that a flood sublimit applies to *all* losses" rather than "only to *certain* losses, . . . the insured may not separately seek to recover a higher amount" under a separate coverage for a loss that was occasioned by the flood.  Id. at *35-37 (emphasis in original) (citing El-Ad 250 W., LLC v. Zurich Am. Ins. Co., 130 A.D.3d 459 (1st Dep't 2015)).

[5] NYU sets forth a number of ways in which the actions of a third-party construction company either exposed or enhanced the exposure of certain NYU facilities to the damage that ensued when Superstorm Sandy struck.  See ECF No. 136 at 18-20.  For example, NYU asserts that the company "removed a ramp leading

As a threshold matter, NYU incorrectly asserts that the Policy included a standalone grant of coverage "for loss resulting from faulty workmanship, provided that such loss [wa]s not otherwise excluded." ECF No. 129 at 22. In fact, the Policy *excluded* faulty workmanship from its coverage and merely *excepted* from this exclusion resulting physical damage of the type otherwise insured by the Policy. See Women's Integrated Network, Inc. v. U.S. Specialty Ins. Co., No. 08 CIV. 10518 (SCR), 2012 WL 13070116, at *8 (S.D.N.Y. Oct. 26, 2012) ("An exception to an exclusion is not equivalent to an affirmative grant of coverage."). The distinction is not academic. By NYU's framing, the Policy covered loss resulting from faulty workmanship all the way up to the overall coverage limit of $1.85 billion. But in reality, the provision at issue only confirmed that if faulty workmanship resulted in a kind of loss covered elsewhere by the Policy -- such as loss from a flood -- it remained covered, subject to the applicable limit of liability, notwithstanding the general exclusion of faulty workmanship from coverage. See RK Mech., Inc. v. Travelers Prop.

_____

to a loading dock . . . and in doing so uncovered and widened the opening to the ventilation shaft for a generator located in [the] basement [of an NYU building]," which contributed to "approximately eleven million gallons of water enter[ing] [the building]" during the storm. Id. at 18. NYU similarly asserts that a defectively designed wall separating two NYU buildings failed, allowing water to travel from one building to the other. See id. at 19.

FM insists that any factfinding on these issues would be premature, as discovery into loss causation has been stayed. FM also contends that these assertions are immaterial because, even accepting NYU's claims of faulty workmanship, NYU's losses were the result of flood under the terms of the Policy. It is sufficient for purposes of this Memorandum and Order that the Court agrees with FM on the latter point.

<u>Cas. Co. of Am.</u>, 944 F. Supp. 2d 1013, 1021 (D. Colo. 2011) ("[Such a] clause . . . does not reinsert coverage for excluded losses, but rather reaffirms coverage for secondary losses ultimately caused by excluded perils." (internal quotation marks omitted)). Thus, whether or not *proper* workmanship would have prevented some portion of the losses that NYU sustained during Superstorm Sandy, those losses are subject to the limits of liability for flood so long as they fall within the Policy's flood coverage.

As stated above, the Policy defined "flood," in relevant part, as:

> flood; surface waters; rising waters; storm surge, sea surge, wave wash; waves; tsunami; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; all whether driven by wind or not; or sewer back-up resulting from any of the foregoing; regardless of any other cause or event, whether natural or man-made, contributing concurrently or in any other sequence of loss.

ECF No. 116, Ex. 7 at NYU033583. The Policy further clarified that "[p]hysical loss or damage from flood associated with a storm . . . is considered to be flood within the terms of this Policy." <u>Id.</u>

Despite acknowledging the (indisputable) connection between its losses and Superstorm Sandy's associated flood waters, NYU insists that the flood definition does not encompass its losses insofar as they were caused by faulty workmanship. But as FM notes, the flood definition expressly encompasses losses from

flood waters "regardless of any other cause or event, whether natural or man-made, contributing concurrently or in any other sequence of loss." Id. This clear language is dispositive in FM's favor: even if faulty workmanship permitted flood waters to wreak havoc on NYU's facilities, the resulting losses fall within the Policy's definition of flood.

As a last resort, NYU invokes "the grammatical 'rule of the last antecedent,' according to which a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." Barnhart v. Thomas, 540 U.S. 20, 26 (2003). In other words, NYU contends that the "regardless" clause "only applies to the immediately preceding phrase '[or] sewer back-up resulting from the foregoing.'" ECF No. 129 at 22. However, the rule of the last antecedent does *not* apply where, as here, the modifying phrase is set off from the list that it follows by the same sort of punctuation that separates the items in the list from one another. See Am. Int'l Grp., Inc. v. Bank of Am. Corp., 712 F.3d 775, 781–82 (2d Cir. 2013). "When a modifier is set off from a series of antecedents [in that way], the modifier should be read to apply to each of those antecedents." Id. at 782. Though listed items are most often separated from one another by commas, this grammatical convention is no less applicable when semicolons are used in their stead. See, e.g., Northrop Grumman Corp. v. Factory Mut. Ins. Co., No. CV0508444DDPPLAX, 2010 WL

11457267, at *7-9 (C.D. Cal. Aug. 26, 2010) (applying an identical modifying phrase in a flood definition to all of the prior items listed -- rather than to only the immediately preceding phrase concerning sewer back-up -- where the items, including the modifying phrase, were separated by semicolons). Accordingly, the "regardless" clause plainly applies to all that precedes it in the flood definition, and NYU's claim is without merit.[6]  FM is therefore entitled to summary judgment once again.

### 4.    The Address Clause

Judging from the parties' briefs and oral argument presentations, the central dispute in this case concerns the proper construction of the address portion of the flood sublimit.  That provision set forth "a USD40,000,000 limit in the aggregate during any policy year for property located at the NYU Hospital Center and School of Medicine located at 550-580 First Avenue, 401 & 435

---

[6] As a corollary to its argument, NYU contends that if the parties had actually intended to apply the "regardless" clause to each antecedent, they would have inserted the word "all" at the beginning, just as they did for the clause "all whether driven by wind or not."  ECF No. 116, Ex. 7 at NYU033583. But the two clauses are situated differently in a material respect.  The "regardless" clause appears at the *end* of the list, as would a typical modifying phrase; thus, no more than a semicolon was needed to signal its application to each antecedent.  See A.J. Temple Marble & Tile, Inc. v. Union Carbide Marble Care, Inc., 87 N.Y.2d 574, 580 (1996) ("[A] descriptive or qualifying phrase [that] *follows* a list of . . . antecedents . . . generally refers to and modifies all of the[m]." (emphasis added)).  In contrast, the "wind" clause appears in the *middle* of the list, where some signaling device -- here, the word "all" -- was needed to communicate its application to that which precedes it.

NYU's emphasis on the word "all" is thus a red herring: had the parties actually intended the "regardless" clause to modify only the immediately preceding "sewer" clause, they would have separated the two clauses with a *comma*, much in the way that they utilized commas within the "regardless" clause itself.

E 30th Street, 317 & 400 E. 34th Street and 3010 [FDR] Drive, New York, NY[.]" ECF No. 116, Ex. 7 at NYU033513. While FM contends that the sublimit applies to all ten of the physically-interconnected buildings located on the superblock bounded by First Avenue to the West, 34th Street to the North, FDR Drive to the East, and 30th Street to the South -- all of which are associated with NYU's hospital or medical school -- NYU insists that it applies only to buildings bearing the specified addresses. The parties thus disagree as to whether the sublimit applies to Skirball Institute, Smilow, and HCC -- the three buildings on the superblock with First Avenue addresses that fall either partially or wholly outside the 550-580 range stated in the provision.[7]

FM argues that the address portion of the flood sublimit should be read as "a reference point telling the reader where to find" the single complex of interconnected buildings that the provision calls the "NYU Hospital Center and School of Medicine," ECF No. 113 at 19, as buildings associated with NYU's hospital and medical school "can be found throughout Manhattan and beyond," ECF No. 129 at 11, and if the parties had really intended to single out three buildings from the superblock complex for an additional

---

[7] Though it is undisputed that the buildings located on the superblock are physically interconnected, NYU stresses that "Smilow is not interconnected to any other building at the basement level; [that] Skirball Institute has no basement; and [that] HCC is not interconnected at the basement level to any other [superblock] building whose basement took on water during Sandy." ECF No. 143 at 2.

$210 million in flood coverage,[8] they would have "state[d] that [the limit] only applies to '*those* NYU Hospital Center and School of Medicine *buildings* located at [the specified addresses],'" ECF No. 113 at 19 (emphases in original). See First Tech. Capital, Inc., 726 F. App'x at 86 ("[Contracts must be] construed in accord with the parties' intent." (internal quotation marks omitted)). NYU counters that "[t]he natural and ordinary meaning of [the address] provision is that the []sublimit applies only to . . . propert[ies] [with] the addresses specified," whether or not they are part of the complex located on the superblock. ECF No. 129 at 11; see Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 598 (2d Cir. 2005) ("[A]mbiguity [does not] exist where one party's view strain[s] the contract language beyond its reasonable and ordinary meaning." (third alteration in original) (internal quotation marks omitted)).

NYU's is certainly the more compelling argument when the language of the provision is viewed on its own. However, the Court is "not charged . . . with considering the [provision] in isolation." Sea Ins. Co. v. Westchester Fire Ins. Co., 51 F.3d 22, 26 (2d Cir. 1995). Rather, "[t]o determine whether a [provision] is unambiguous, . . . the contract must be considered

---

[8] For the sake of clarity, this $210 million figure represents the difference between the $250 million flood limit that applies to losses at all insured properties and the $40 million flood sublimit that applies to losses at only a subset of insured properties.

as a whole." Brad H., 17 N.Y.3d at 185. Viewing the provision in the context of other provisions in the Policy, its ambiguity becomes apparent.

Of particular relevance is the schedule of locations appended to the Policy (and incorporated therein), which listed insured locations alongside their addresses.[9]  Though the entries for Smilow and HCC disclose nothing of note, reporting their addresses as 522 First Avenue and 530 First Avenue, respectively, the two separate entries for Skirball Institute -- one in the section listing "NYU SCHOOL OF MEDICINE PROPERTIES" and one in the section listing "NYU HOSPITALS CENTER PROPERTIES" -- sow considerable confusion.  ECF No. 116, Ex. 7 at NYU033595, NYU033598. Specifically, the former entry listed the insured location "SKIRBALL INSTITUTE 564 FIRST AVENUE" as having four separate addresses: "540, 562, 564, [and] 584 First Avenue." Id. at NYU033595.  The latter entry listed the insured location "SKIRBALL INSTITUTE" as having three separate addresses: "540, 562, [and] 584 First Avenue." Id. at NYU033598.  Adding to the confusion is a third entry, in the "NYU HOSPITALS CENTER PROPERTIES" section, that listed the insured location "Resident/Staff" as having the address "564 FIRST AVENUE." Id. at NYU033599.

---

[9] The Policy stated that, "unless otherwise provided," "coverage under this Policy applies to an insured location . . . as listed on the Schedule of Locations, Appendix A, attached to this Policy."  ECF No. 116, Ex. 7 at NYU033510; see also id. at NYU033584 (defining "insured location" as, in relevant part, "as scheduled on this Policy").

The schedule of locations thereby exposes a glaring ambiguity in the address portion of the flood sublimit: one must necessarily refer to the schedule to determine which buildings correspond to the addresses listed in the sublimit, yet it is impossible to determine on that basis whether or not Skirball Institute falls within the list. That is because Skirball Institute's multiple addresses simultaneously place it both in and out of the 550-580 First Avenue range stated in the sublimit. This lends credence to FM's (otherwise questionable) *referential* reading of the address list while casting doubt on NYU's (otherwise sensible) *literal* reading of the same. But at bottom, it demonstrates that the operative provision, "read [in the context of the contract] as a whole, fails to disclose its purpose and the parties' intent." Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 25 N.Y.3d 675, 680 (2015) (internal quotation marks omitted). Though one can certainly conceive of explanations that would square the apparent incongruity with either party's reading of the provision, no such explanation can be found within the four corners of the contract. The provision is therefore ambiguous, and resort must be made to the parties' extrinsic evidence to shed light on its meaning.[10]

---

[10] The extrinsic evidence aids the Court's assessment of the parties' competing explanations for the Policy's inclusion of multiple addresses for Skirball Institute. NYU asserts that Skirball Institute's true address is "540 First Avenue," ECF No. 129 at 5 n.4; that "562 and 584 First Avenue [are] not correct addresses for [it]," ECF No. 122 at 60 (internal quotation marks

FM begins by setting forth unrebutted evidence that -- in several contexts -- NYU internally understood the buildings on the superblock to comprise a single complex (variously referred to as "Langone Medical Center," "the medical center," or "the Main Campus") and that the address "550-580 First Avenue" was commonly used to refer to it in its entirety, even though several buildings in the complex either had First Avenue addresses outside that range or lacked First Avenue addresses altogether. For example, FM notes that NYU's Associate Director of Insurance Deborah DiGiacomo admitted that she had "seen the address 550-580 First Avenue used to describe the entire medical center" by "people" at NYU. ECF No. 122 at 60 (internal quotation marks omitted). DiGiacomo's predecessor, Paulette Prawl, likewise testified that she had "seen or heard people within NYU use 550-580 First Avenue to describe the Medical Center." Id. (alteration and internal quotation marks omitted). FM next demonstrates that -- at least in some respects

omitted); and that "564 First Avenue [is actually] a separate location from Skirball Institute," ECF No. 129 at 12 n.11. However, overwhelming documentary evidence tells a different story. For example, a map of the superblock created by NYU's Real Estate Development & Facilities group depicts Skirball Institute as a single structure and designates its addresses as "540, 562, 564 and 584 First Ave." ECF No. 116, Ex. 13 at NYU081808 (footnote omitted). Another map, also created by NYU, likewise depicts a single structure labeled "Skirball/MUB" and designates its addresses as "540 and 564 1st Ave." ECF No. 127, Ex. 56 at NYU111088 (emphasis in original). Additionally, the certificate of occupancy for the property, issued by the City of New York, lists its address as "540 FIRST AVENUE AKA 564 FIRST AVENUE," ECF. No. 137, Ex. 129 at NYU161851, and a separate document concerning NYU's insurance coverage describes a single "Insured Location" as "540-562 1ST AVE," ECF No. 137, Ex. 155 at NYU122726. There is therefore no basis for accepting NYU's claim that "the proper address for Skirball Institute [is] '540' First Avenue," that it is distinct from any property addressed 562, 564, or 584 First Avenue, and that it is therefore unequivocally outside the 550-580 First Avenue range stated in the sublimit. ECF No. 122 at 62.

-- this internal understanding was unquestionably imported into NYU's dealings with FM. FM cites several insurance-related documents exchanged by the parties in which the "Medical Center" is described as located at 550-580 First Avenue. Among them are "[a]t least five separate risk reports prepared by FM Engineering and sent to NYU between 2006 and 2012," which "included a cover page listing '550-580 1st Ave' as the address for the Medical Center," and which "addressed each of the Medical Center buildings, including HCC, Skirball, and Smilow." Id. at 55. Finally, FM seeks to prove that this convention was incorporated directly into the flood sublimits contained in the series of policies -- including the Policy -- that the parties executed in the years preceding Sandy. See Hoyt v. Andreucci, 433 F.3d 320, 332 (2d Cir. 2006) (emphasizing the relevance of extrinsic evidence of the parties' course of dealing to the construction of an ambiguous contractual provision). The evidence establishes the following sequence.

The 2006 version of the parties' policy for the first time introduced a flood sublimit, which provided "USD10,000,000 for New York University Medical Center Properties, Index 21374.00." ECF No. 122 at 47 (internal quotation marks omitted). By the 2008 policy, the flood sublimit contained additional coverage and slightly different wording; it provided that "[a] USD25,000,000 limit applies at the following Location: [] New York Medical Center

properties, Index 21374.00." <u>Id.</u> at 49 (internal quotation marks omitted). The next year, in 2009, the flood sublimit for the first time included an address description, providing that "[a] USD25,000,000 limit applies at the following Location: [] NYU Hospitals Center and School of Medicine located at 550-580 First Ave., 401 & 435 E 30th Street, 317 & 400 E 34th Street, and 3010 FD Roosevelt Dr., New York, NY Index No. 21374.00." <u>Id.</u> (internal quotation marks omitted). And by endorsement effective July 1, 2010, the flood sublimit was again amended slightly to provide "a USD40,000,000 limit in the Aggregate During Any Policy Year for property located at NYU Hospitals Center and School of Medicine located at 550-580 First Ave., 401 & 435 E 30th Street, 317 & 400 E 34th Street, and 3010 [FDR] Drive, New York, NY Index No. 21374.00." <u>Id.</u> at 66; <u>accord</u> ECF No. 116, Ex. 83. NYU has admitted -- in response to a request for admission -- that each of the aforementioned sublimits applied to all of the buildings on the superblock, including Skirball Institute, Smilow, and HCC. <u>See, e.g.</u>, ECF No. 122 at 67.

The Policy, which went into effect in 2011, introduced the operative sublimit. The only difference between that sublimit and the 2010 version it replaced -- which undisputedly applied to the entire superblock -- is the omission of the index number 21374.00, which had appeared in each iteration of the sublimit since its

inception in 2006.[11]  Meanwhile, that index number continued to designate all of the buildings on the superblock in the Policy's schedule of locations.

FM argues that the removal of the index number from the sublimit did not suddenly transform the address range, which the parties had apparently understood to reference the entire superblock in the 2010 policy, into a literal, exhaustive description of the buildings covered.  NYU counters that no transformation was necessary; it disputes that the "address [range] in [the] prior policies applied to all [superblock] locations" and contends instead that "it was the . . . index number . . . that" extended the sublimit in that way, as "all [superblock] locations" were designated by that index number in each policy's schedule of locations.  ECF No. 129 at 17-18.  NYU's reading of the earlier sublimits, however, eschews basic principles of contract interpretation, as it would render the address range and index number -- which stood side-by-side in each sublimit -- irreconcilably contradictory.  Thus, in view of the parties' well-established course of dealing, NYU's preferred construction of the operative sublimit may carry the day over FM's only if NYU can point to evidence showing that the removal of the index number

_____

[11] The Court notes that the 2011 and 2010 sublimits have certain additional differences -- principally, differences in capitalization, punctuation, abbreviation, and pluralization -- that are mentioned by neither party and that are immaterial as a matter of law.

reflected an intent on the part of the parties to -- for first time -- except three superblock buildings from the sublimit and thereby provide them with an additional $210 million in flood coverage.  NYU cannot make such a showing.

NYU's proffered explanation for the removal of the index number would strain the credulity of any reasonable trier of fact: relying on evidence that Marsh (NYU's broker) requested an increase to the $40 million sublimit prior to the execution of the Policy in June 2011,  NYU reasons that FM's subsequent removal of the index number, which left only the address range to control, was intended as a "partial[] accommodat[ion]" of that request, as it kept in place the $40 million limit for most superblock buildings "while at the same time . . . increase[ing] the limit for HCC, Smilow and Skirball Institute" to $250 million.  ECF No. 129 at 17, 19 n.20; see also id. at 17.  This inferential leap, which smacks of post-hoc rationalization approaching desperation, finds no support in the record[12] and suffers from several cumulatively-fatal flaws.

---

[12] The two pieces of evidence on which NYU relies do not actually support its position.

First, NYU points to evidence that in 2012, it procured excess flood insurance (from a different insurer) for fewer than all of the buildings in the superblock complex.  As NYU frames it, this excess insurance covered "only those First Avenue buildings with addresses in the 550 to 580 range."  ECF No. 122 at 136.  NYU thus seeks the inference that it understood the First Avenue buildings *outside* the 550-580 range to have already received $210 million in additional coverage by dint of the index number's removal from the 2011 sublimit.  But as FM points out, while Smilow and HCC were concededly not covered by the excess insurance that NYU procured, Skirball Institute *was* so covered -- despite having two First Avenue addresses (540 and 584) outside the 550-580 range.  No

First, NYU's request for additional coverage was directed at the entire superblock complex; NYU never sought to carve out particular buildings from the sublimit, let alone the three buildings it claims were carved out. Second, the additional coverage that NYU actually requested -- an extra $10 million for the entire superblock complex -- is staggeringly modest compared to the $210 million that NYU claims FM granted it for the three disputed buildings, without so much as a discussion between the parties about a concomitant increase to NYU's premium. Third, the supposed selection of Skirball Institute, Smilow, and HCC for additional coverage would appear entirely arbitrary; the buildings are neither directly adjacent to one another nor categorically subject to a lesser risk of flood than the other buildings on the

_____

reasonable trier of fact could credit NYU's entirely speculative explanation for this defect in its reasoning -- that in procuring excess insurance from a different insurer, NYU's sophisticated broker, whose client insists in this litigation that Skirball Institute has a clearly delineated address outside the 550-580 range, "simply relied on the incorrect addresses supplied for Skirball[] by FM."  Id.

The other piece of evidence that NYU deems supportive is the deposition testimony of Marsh employee Ian Anderson, who stated that after he "noted" the removal of the index number in a conversation with an FM employee, the FM employee responded "angr[ily]" and "just shouted it is what is is, okay."  ECF No. 122 at 124.  Insofar as NYU argues that this testimony gives rise to the inference that Marsh believed that the removal of the index number had increased the flood coverage for Smilow, HCC and Skirball Institute, that inference is squarely negated by Marsh's unambiguous summary of the Policy, discussed infra. Insofar as NYU argues that this testimony gives rise to the inference that the FM employee responded angrily because he "did not want to have to explain that Smilow, HCC and Skirball Institute were removed from the [flood] []sublimit because they were not high risk locations and should never have been included in the first place," that inference is unreasonably speculative as a matter of law.  ECF No. 129 at 19.

Issues of credibility thus have no bearing on the sufficiency vel non of NYU's evidence.  Even accepting NYU's recitation of the facts and the veracity of the cited witness testimony, the implausibility of the inferences on which NYU relies dooms its case.

superblock.  Fourth, carving out three of the interconnected
superblock buildings from the sublimit -- including only part of
the single structure depicted or described in various documents as
Skirball Institute -- would have violated FM's internal
guidelines, which instruct underwriters not to "apply separate
flood limits to buildings within one location (index number) as
flood analysis is not that precise and interdependencies may
exist." Id. at 38 (internal quotation marks omitted).  Finally
-- and perhaps most damning to NYU -- there is not a shred of
evidence (documentary or otherwise), that FM ever so much as
mentioned (internally or otherwise) substantially increasing NYU's
flood coverage (in the manner suggested by NYU or otherwise).
Indeed, there is no evidence that NYU even acknowledged the
dramatic increase in coverage it claims to have received or that
its broker, Marsh, ever sought to claim credit for what would have
been a job very well done.  NYU thus asks that a jury be permitted
to conclude that FM provided a coverage increase in the hundreds
of millions of dollars *sub silentio*, without NYU or its broker
deeming it worthy of their comment.

No reasonable jury could do so, particularly in view of the
affirmative evidence of the parties' contrary understanding: in
the exhaustive summary of the Policy prepared for NYU in 2011, the
very broker who had negotiated with FM for an increase to the
sublimit reported that the flood coverage had *not* in fact been

changed from the prior year.  See Ribacoff v. Chubb Grp. of Ins. Companies, 2 A.D.3d 153, 154 (2003) (imputing the knowledge of an insurance broker to the insured).  That summary provided in relevant part:

> [NYU] has elected to renew according to expiring coverage limits except for the policy limit which has been increased to $1,850,000,000: [FM is] unable at this time to provide additional limits for Flood for property located at the NYU Hospital Center and School of Medicine located at 550-580 First Avenue, 401 & 435 E. 30th Street, 317 & 400 E. 34th Street and 3010 [FDR] Drive, new York, NY: the limit remains $40,000,000 in the annual aggregate.

Id. at 71.  NYU erroneously argues that the omission of the 21374.00 index number from that summary means it can be reconciled with NYU's position; the summary clearly stated that the *only* change to coverage was an increase in the overall policy limit, and there is no basis for inferring that this description was incomplete.  See ECF No. 113 at 24 n.112 (pointing out that the 17-page summary identified changes as minor as typographical errors).  For the avoidance of doubt, the summary included a chart that compared each limit of liability in the 2010 policy to its counterpart in the 2011 version; an entry for "Flood - SoM/NYUMC [i.e., School of Medicine/New York University Medical Center] *Index 21374.00*" featured the same "$40,000,000" in both the "2010" and "2011" columns.  ECF No. 116, Ex. 7 at NYU033500 (emphasis added).  This evidence, which coheres with the course-of-dealing evidence described above, is a compelling indication that the

parties neither intended to substantively (and substantially) change the sublimit in 2011 nor believed that any such change had been effected. Because NYU has offered insufficient countervailing evidence to persuade a jury otherwise, FM is entitled to summary judgment on the parties' dueling claims for declaratory relief.

## 5. **Breach of Contract**

In light of the foregoing rulings, there is no basis in the record for concluding that FM wrongfully denied NYU coverage. Accordingly, FM is entitled to summary judgment on NYU's claim for breach of contract.

## III. **Conclusion**

For the reasons stated herein, FM's motion for summary judgement is granted in all material respects,[13] while NYU's cross-motion for summary judgment is denied in its entirety.

The Clerk of Court is respectfully directed to terminate the motions currently pending at ECF Nos. 111 and 121 and to close the case.

**SO ORDERED.**

Dated:     New York, New York
           March 19, 2019

                                        _Naomi Reice Buchwald_

                                        NAOMI REICE BUCHWALD
                                        UNITED STATES DISTRICT JUDGE

---

[13] As a technical matter, so much of FM's motion that seeks summary judgment on its counterclaim for reformation is denied as moot in light of the Court's grant of summary judgment for FM on its counterclaim for declaratory relief.